COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Fulton and Lorish
Argued at Richmond, Virginia

**PUBLISHED**

JONATHAN BRENTON GRIFFIN

v.        Record No. 0485-22-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
AUGUST 1, 2023

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge

Heidi Meinzer (Law Office of Heidi Meinzer, PLLC, on briefs), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Jonathan B. Griffin, a former police officer with the City of

Alexandria, was convicted of assault and battery for using excessive force against a handcuffed

man in his custody on January 27, 2020.  On appeal, Griffin contends that his constitutional due

process rights were violated when the same investigating officer conducted both the

administrative and criminal investigations of the incident.  *See Garrity v. New Jersey*, 385 U.S.

493 (1967).  Second, he contends that the trial court erred in overruling his *Batson* challenge to

the Commonwealth's use of its peremptory strikes.  *See Batson v. Kentucky*, 476 U.S. 79 (1986).

Third, he contends that the trial court erred by denying the admission of certain evidence

concerning the victim's character.  Fourth, he contends that the trial court did not properly

instruct the jury.  Finally, he contends that the evidence was insufficient to prove that he

committed assault and battery.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Scott v. Commonwealth*, 292 Va. 380, 381 (2016).

## A. The Incident

In January 2020, Jonathan B. Griffin worked as a police officer for the City of Alexandria and as a residential community officer in the apartment building where James Lenzen lived. On January 27, 2020, Griffin took Lenzen into emergency custody pursuant to his authority as a police officer under Code § 37.2-808(G).[1] Griffin handcuffed Lenzen's hands behind his back and transported him to INOVA Alexandria Hospital (the "Hospital"). Security video footage from the Hospital emergency room that day was entered into evidence at trial and shows Griffin guiding a compliant Lenzen to the registration desk with a single hand.

Cyd Fields, a Hospital employee, helped to "register [Lenzen] into the [e]mergency [r]oom." The security video footage shows Lenzen standing relatively still near the registration desk while he waited for Griffin and Fields to get him registered. A woman, later identified as Dr. Katherine Lewis, walked down the hall toward them. Although she turned into a patient room before she reached them, Griffin decided to move Lenzen a few steps closer to the registration desk. Seconds later, the security video footage shows that Griffin grabbed Lenzen with both hands and used his right leg to sweep Lenzen's legs out from under him. As a result, Lenzen, whose hands were still

---

[1]

> A law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Code § 37.2-808(G).

handcuffed behind his back, fell face-first onto the hard hospital floor, sustained facial injuries (including a contusion above his right eye and an abrasion to his nose), and broke his kneecap.

At trial, Kelly Godette (a Hospital employee) testified that he saw Griffin and Lenzen at the registration desk and that he overheard Griffin tell Lenzen "to keep still." Lenzen was "moving back and forth" a little bit but "was not harming anybody." He testified that Griffin then said, "I told you to keep still," and swept Lenzen's legs out from under him. According to Godette, Lenzen had not made any movements toward Dr. Lewis, Godette, or Griffin and had not made any movements that suggested that he was going to run.

Fields (who was standing behind Griffin and Lenzen and was at arm's length from them during the assault) testified that she did not see Lenzen doing anything immediately before the assault and did not hear Lenzen say "anything provoking." She further testified that all she heard Griffin say was "stop or stop resisting. And the next thing I know, he's on the floor." Fields emphasized that she "didn't see him [Lenzen] doing any type of resisting."

Griffin, who numerous individuals stated was generally quite well-regarded as a member of the police force in Alexandria, testified in his own defense. He agreed that Lenzen was initially cooperative while they were standing at the registration desk. Griffin then observed "a doctor moving down the hallway" toward them and claimed that he "asked [Lenzen] to move towards the registration desk" because he "wanted to create space in that hallway." According to Griffin, Lenzen "pulled back and resisted my control of him." Griffin claimed that he tried to calm Lenzen down but was unsuccessful, so he then used "a more authoritative voice and told [Lenzen] to stop resisting."[2] According to Griffin, he decided to put Lenzen on the ground because he thought

---

[2] Paramedic David Fox, who was the farthest eyewitness away from Griffin and Lenzen at the time of the incident who also testified at trial, testified that he heard Griffin tell Lenzen "to calm down, and to not move away from him. To come back over to where he was." However, Fox acknowledged that he did not "visually lock in" on Griffin and Lenzen during the incident.

Lenzen "was putting himself in a position where he could assault me." At trial, Griffin admitted, "I didn't react properly" because he had actually intended to use some technique other than a leg-swipe to bring Lenzen to the ground.

Griffin further testified that, at the time of the incident, he was concerned about Lenzen. He knew Lenzen suffered from bipolar disorder. He testified that he was also aware that Lenzen had "made threats to several government installations and had a previous conviction of arson." Griffin also testified that he had heard that Lenzen had assaulted a nurse and a deputy at a mental health hospital in the past and that Lenzen "had physically confronted firefighters" in the past. However, Griffin conceded on cross-examination that, on the day in question, Lenzen never said anything to indicate that he wanted to harm himself or others. Griffin also acknowledged that Lenzen had been searched for weapons before arriving at the Hospital and remained in handcuffs while at the Hospital. Furthermore, Griffin admitted that Lenzen had not made any verbal threats toward Hospital staff and did not indicate that he had tried to bite or spit at anyone in the Hospital.

### B. The Investigation

Directly after the incident, Griffin promptly filed a police report and included two attachments—one containing three pictures of Lenzen's injuries and one containing the Hospital security video footage of the incident. Sergeant John East, an internal affairs investigator with the Alexandria Police Department, reviewed Griffin's report and initiated an internal administrative investigation for possible "excessive use of force." As part of the administrative investigation, Sergeant East interviewed Griffin, David Fox (a paramedic with the Alexandria Fire Department), and a number of law enforcement officers. Although Sergeant East initially concluded that Griffin's actions did not rise to "a criminal level," Alexandria Police Chief Mike Brown ordered Sergeant East to initiate a criminal investigation. As part of his criminal investigation, Sergeant East viewed the Hospital surveillance footage of the incident and "went

to the hospital and asked around" to find potential witnesses he could interview. After interviewing those witnesses, Sergeant East concluded that criminal charges were warranted.

Before trial, Griffin filed a "Motion to Dismiss, or in the Alternative, to Suppress." The trial court held a hearing on Griffin's motion where Sergeant East testified about the administrative investigation and the criminal investigation he conducted. Sergeant East testified that he understood that Griffin's statements during the administrative investigation were protected under the United States Supreme Court's decision in *Garrity* and, therefore, could not be considered in his criminal investigation. He also consistently testified that he maintained a wall between both investigations. Furthermore, when he gave his criminal investigation file to the Commonwealth, Sergeant East only included information obtained from the witnesses with whom he spoke, including those at the Hospital. Sergeant East testified that he specifically did not give any of Griffin's protected statements to the Office of the Commonwealth's Attorney.

After hearing Sergeant East's testimony, the trial judge stated, "I just don't think that there's any evidence that any conversation he may have had with Mr. Griffin prompted him to talk to some other witness." The trial court then found that "there's no evidence before the Court that there was anything" derived from Griffin's protected statements. Finally, the trial court assessed Sergeant East's credibility and found that Sergeant East "was very careful not to talk about anything that Mr. Griffin told him." Consequently, the trial court denied Griffin's motion.

## C. *Voir Dire*

The case eventually went to a jury trial. During *voir dire*, Juror 1 informed the trial court that she knew Juror 21 because their "kids went to elementary school together. And then [Juror 21] was my son's soccer coach in prep week . . . [b]ack when we, like we live[d] three blocks away." The prosecutor then asked both Juror 1 and Juror 21 whether, if they served on the jury together, their opinions would unduly influence each other. Juror 21 simply responded, "No," without further

- 5 -

elaboration. However, Juror 1 explained, "I'm trying to think carefully. I mean, yes, I know him but it's not going to unduly influence my opinion in any, one way or the other I don't believe."

The prosecutor also asked whether any of the prospective jurors had preconceived biases toward believing the "testimony of a police officer just based on his or her profession alone." Juror 17 stated that he "would probably credit the police officer slightly" more than an average citizen. Next, the prosecutor asked whether any of the prospective jurors had anyone in their lives suffering "from a severe mental illness" because the allegations in this case involved a person with bipolar disorder. Juror 14 informed the trial court that his "ex-wife was diagnosed with a bipolar disorder" and that he would probably be thinking about his ex-wife when hearing the evidence in this case. Juror 23 did not answer any questions during *voir dire*.

The prosecutor used her peremptory strikes to remove Juror 14, Juror 17, Juror 21, and Juror 23 from the panel. Griffin challenged all four of the Commonwealth's peremptory strikes under *Batson*, arguing that the Commonwealth had used its peremptory strikes to remove "all white males" from the jury. The prosecutor explained that she had struck Juror 14 because he had "outside knowledge of the mental illness, his wife has bipolar." The trial court accepted this explanation as gender-neutral and race-neutral, and Griffin never argued to the trial court that this explanation was merely pretextual. Next, the prosecutor explained that she had struck Juror 17 because he said he would credit police slightly more than the average citizen. The trial judge responded, "Yes, I was surprised he wasn't stricken" earlier and concluded that this was "certainly a legitimate reason" to strike Juror 17 from the venire. Griffin did not argue that this explanation was merely pretextual either.

The prosecutor then explained that she struck Juror 21 from the venire because "he was a neighbor of [Juror 1] and I didn't want both of them on the panel." The prosecutor added that Juror 21 "also rolled his eyes at several attempts of humor to include Your Honor's at the very end."

- 6 -

Griffin argued that this explanation was pretextual because, given the stated reason, the Commonwealth should have struck Juror 1 instead or at least waited to see whether the defense would strike Juror 1 first. The trial court, however, found that the explanation was not pretextual. Finally, the prosecutor explained that she struck Juror 23 because he "didn't talk at all so I don't have any information about him." She also explained that she "couldn't see him [Juror 23] during most of the selection" process. Consequently, "without any comments, any interaction," she simply did not "know enough about him." Griffin again argued "that would be an insufficient reason." The trial court, however, found the explanation was not pretextual. Consequently, the trial court overruled Griffin's *Batson* challenge.

### D. Admission and Exclusion of Character Evidence

During trial, Griffin sought to introduce several pieces of evidence concerning Lenzen's mental health history and aggressive behavior from various sources. Specifically at issue in this appeal are: (1) the proffered testimony of Lenzen's case manager from the Alexandria Community Services Board that, in the days leading up to the incident, Lenzen had "more disorganized thoughts, hadn't shaved[,]" and "often required redirecting," (2) the proffered testimony of an Alexandria firefighter who had witnessed Lenzen become aggressive in the past, (3) the proffered testimony and supporting documentation from the doctor who evaluated Lenzen *after* the incident and determined that a temporary detention order was appropriate at that time, (4) the proffered testimony and supporting documentation about a 2019 incident between Lenzen and staff at a different hospital, (5) the proffered testimony and supporting documentation about Lenzen's behavior the day *after* the incident, (6) the proffered testimony and supporting evidence of Lenzen's behavior at a different facility six months *after* the incident, and (7) a certified copy of Lenzen's conviction for arson in 1994. The Commonwealth objected on the grounds that this evidence was not relevant, was hearsay, or was a violation of Virginia Rule of Evidence

2:404(b).  The trial judge agreed with the Commonwealth's objection and therefore excluded this

evidence.  However, the trial court specifically allowed Griffin to testify regarding what he knew

about Lenzen's mental health and behavioral history that informed and affected Griffin's

decisions that day.

### E.  Instructing the Jury

At the close of all the evidence, but before the jury retired for deliberation, Griffin proffered

Jury Instruction I which stated:

> Every person has the legal right not [to] be subjected to unreasonable
> or excessive force by a police officer.  On the other hand, an officer
> has the right to use such force as an objectively reasonable officer
> would believe reasonably necessary given the facts and
> circumstances known to the officer at the time the force is used.
> Police officers may use force to protect themselves or others against
> those persons whose actions would lead an objectively reasonable
> officer to believe pose a pending threat of assault against themselves
> or others given the facts and circumstances known to the officers at
> the time the force is used.  You may not consider whether the officer
> could have used lesser force or some other method to protect himself
> or others.  Whether the force used was objectively reasonable is an
> issue for you to decide on the basis of that degree of force that an
> objectively reasonable officer would use under the circumstances
> presented to you during this trial.  The test of objective
> reasonableness requires careful attention to all the facts and
> circumstances you conclude were known to the officer when he
> acted.

Griffin's counsel informed the trial court that the contents of this instruction had come from

"*Graham v*[.]*Connor*, 490 U.S. 386, which is the seminal use of force case."  The Commonwealth

objected to the instruction because "[t]his instruction is, in essence, argument.  And it's telling the

jury what they may or may not consider."  The trial court denied proffered Jury Instruction I.

Griffin also objected to the Commonwealth's instruction about the elements of the offense

of assault and battery, admitted as Jury Instruction 11, because he preferred his proffered Jury

Instruction L.  Specifically, he preferred that proffered Jury Instruction L had split the very same

- 8 -

elements of battery in three rather than two, as set out in paragraph 1 of Jury Instruction 11.

Paragraph 1 of proffered Jury Instruction L stated:

> The defendant is charged with the crime of assault and battery. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime: (1) That the defendant willfully touched James Lenzen[;] (2) That the touching was done without legal excuse or justification; and (3) That the touching was done in an angry, rude, insulting, or vengeful manner.

Jury Instruction 11, which has four paragraphs, stated:

> The defendant is charged with the crime of assault and battery. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime: (1) That the defendant willfully touched James Lenzen without legal excuse or justification; and (2) That the touching was done in an angry, rude, insulting, or vengeful manner.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty of assault and battery.
>
> If you find that the defendant had a legal excuse or justification to touch James Lenzen but that the force used during the touching was excessive, then you shall find the defendant guilty of assault and battery.
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt any of the above elements of the crime as charged, then you shall find the defendant not guilty.

Griffin argued to the trial court that the third paragraph of Jury Instruction 11 would be confusing to the jury. As noted above, paragraph 3 of Jury Instruction 11 states, "If you find that the defendant had a legal excuse or justification to touch James Lenzen but that the force used during the touching was excessive, then you shall find the defendant guilty of assault and battery." During jury deliberations, the jury sent a question to the judge seeking clarification on paragraph 3 of Jury Instruction 11. Specifically, the jury asked, "Do both elements (1 & 2) apply to be found guilty? Paragraph 3 seems to negate Paragraph 1 by stating that the focus of the charge is based on

the force used being excessive, is this accurate?" The trial court provided a written response to the jury stating, "Whether the touching was without legal excuse or justification or if there was legal excuse or justification but the force was excessive the Commonwealth, *in either event*, must prove that the touching was done in an angry, rude, insulting, or vengeful manner." (Emphasis added).

After the trial court provided this clarifying instruction, the jury found Griffin guilty of assault and battery. Griffin now appeals that conviction to this Court.

## II. ANALYSIS

### A. *Garrity* Issue

First, Griffin argues that the trial court erred "by not dismissing the charges against Appellant, or alternatively, by allowing certain evidence and testimony from Sergeant John East, who took compelled statements from Appellant during the related administrative proceeding prior to personally conducting the criminal investigation, in violation of *Garrity v. New Jersey*, 385 U.S. 493 (1967) and Appellant's Due Process rights."

The Fifth Amendment's privilege against self-incrimination, which applies to the States through the Fourteenth Amendment, states that no person "shall be compelled in any criminal case to be a witness against himself." *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *J.D. v. Commonwealth*, 42 Va. App. 329, 339 (2004). In *Garrity*, the United States Supreme Court held that this Fifth Amendment privilege against compelled self-incrimination protects employees, such as police officers, who are required to answer potentially incriminating questions in an administrative interview conducted by their employer. 385 U.S. at 497. In such situations, if the employee is faced with choosing "either to forfeit their jobs or to incriminate themselves," *id.*, this Fifth Amendment privilege prevents those compelled employee statements from being admitted against him in a criminal trial. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977). *Garrity*'s progeny further expanded the privilege to encompass evidence derived from

such compelled statements. *See United States v. Hubbell*, 530 U.S. 27, 37 (2000) ("It has, however, long been settled that its protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence."); *see also Kastigar v. United States*, 406 U.S. 441, 461 (1972).

When the Commonwealth pursues a criminal conviction of an employee who has given potentially incriminating statements in an administrative interview conducted by his employer, the Commonwealth has the burden "not merely to show that its evidence is not tainted by the prior testimony, but 'to prove that the evidence it proposes to use is derived from a legitimate source *wholly independent of the compelled testimony*.'" *Hubbell*, 530 U.S. at 40 (emphasis added) (quoting *Kastigar*, 406 U.S. at 460); *see also Gosling v. Commonwealth*, 14 Va. App. 158, 164 (1992) ("Derivative use immunity prohibits use against the witness of evidence even indirectly obtained from his testimony."). The Supreme Court of Virginia has held that a trial court's "taint determination is a factual finding." *Welsh v. Commonwealth*, 246 Va. 337, 345 (1993) (quoting *United States v. Harris*, 973 F.2d 333, 337 (4th Cir. 1992)). "[A]s with most factual determinations, the outcome depends upon whether the trier-of-fact chooses to believe or disbelieve a particular witness or a particular group of witnesses." *Id.* at 354. Consequently, on appeal this Court "will reverse the factual finding of the trial court only if it is plainly wrong or without evidence to support it." *Zelnick v. Adams*, 269 Va. 117, 123 (2005).

Here, before Sergeant East spoke with Griffin during the administrative investigation, Sergeant East gave Griffin a "Garrity Form" which states that the "employee can be compelled to respond and failure to do so is subject to disciplinary action up to and including termination." While Griffin's statements given during the administrative interview are protected under *Garrity*, we cannot say that the trial court erred by denying Griffin's pre-trial motion to dismiss, given

that the Commonwealth obtained all of its incriminating evidence "from a legitimate source wholly independent of the compelled testimony." *Hubbell*, 530 U.S. at 40. After hearing Sergeant East testify at the hearing on the motion to dismiss, the trial judge stated, "I just don't think that there's any evidence that any conversation he may have had with Mr. Griffin prompted him to talk to some other witness." The trial court therefore concluded that "there's no evidence before the Court that there was anything" derived from Griffin's protected statements.

Sergeant East repeatedly emphasized that he maintained a wall between the administrative investigation and the criminal investigation and that he did not use Griffin's protected statements in his criminal investigation to find incriminating evidence. Instead, Sergeant East testified that he relied on the Hospital surveillance video of the incident, which Griffin had voluntarily given to the Alexandria Police Department prior to the start of either the administrative investigation or the criminal investigation. After viewing the Hospital surveillance video footage, Sergeant East then "went to the hospital and asked around" to find potential witnesses he could interview. Thus, the evidence supports the trial court's conclusion that Sergeant East interviewed the relevant witnesses from the Hospital solely because of the Hospital surveillance footage.

Furthermore, when Sergeant East gave his criminal investigation file to the Commonwealth's attorney, he only included information he obtained from the witnesses with whom he spoke, including those at the Hospital. However, Sergeant East specifically did not give Griffin's protected statements to the prosecutors. Thus, the Commonwealth's attorney never had access to Griffin's protected statements, and, as noted by the trial judge, Sergeant East "on the stand was very careful not to talk about anything that Mr. Griffin told him." Given all of the evidence in the record, we certainly cannot say that the trial court was plainly wrong or

without credible evidence in finding that the Commonwealth derived its incriminating evidence of Griffin from sources wholly independent of Griffin's protected statements.

Indeed, while the Commonwealth bore the burden of proving by a preponderance of the evidence that Sergeant East's administrative investigation did not taint the Commonwealth's criminal case, "the burden of proof imposed by *Kastigar* does not require the prosecution to 'negate every abstract possibility of taint.'" *Welsh*, 246 Va. at 353 (internal citations omitted). Instead, "[t]he focus of the inquiry under *Kastigar* . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *Id.* at 353-54 (quoting *Harris*, 973 F.2d at 338). Here, the Commonwealth's attorney never used—or even viewed—Griffin's protected statements because the Commonwealth never received the statements from Sergeant East.

In short, there simply is no evidence in the record before this Court on appeal that the Commonwealth used Griffin's protected statements in any way to develop its case. While it certainly was not advisable or wise for the police department to have Sergeant East conduct both the administrative investigation and the criminal investigation of Griffin (a point Sergeant East made to the then-chief of police), *Garrity* and its progeny did not create a *per se* rule requiring different investigators for the different investigations. *See Harris*, 973 F.2d at 337 ("It is true that courts have generally declined to erect a *per se* rule requiring withdrawal of a prosecutor or other government official who may have been exposed to immunized testimony, and we do not erect such a rule here."). Consequently, given that the Commonwealth's attorney never had access to Griffin's protected statements and given that there is no evidence that the Commonwealth derived its evidence from Griffin's protected statements, we certainly cannot say that the trial court erred in finding that Sergeant East's actions in the criminal investigation of Griffin tainted the Commonwealth's case against Griffin.

## B. *Batson* Challenge

In Griffin's second assignment of error, Griffin contends that the trial court "erred by denying Appellant's objections to the Commonwealth using its peremptory strikes to strike four white male jurors on the venire in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986)." When a defendant raises a *Batson* challenge, the defendant bears the burden of making a *prima facie* case of purposeful discrimination on the basis of race or gender by the prosecutor in using a peremptory strike against a juror. *Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) (holding that "litigants may not strike potential jurors solely on the basis of gender"); *see also Jackson v. Commonwealth*, 266 Va. 423, 436 (2003), *cert. denied*, 543 U.S. 842 (2004). The burden then shifts to the prosecution to produce race-neutral and gender-neutral explanations for striking the juror. After the prosecution provides a race-neutral and gender-neutral explanation for striking the juror, "[t]he defendant may then provide reasons why the prosecution's explanations were pretextual and the strikes were discriminatory regardless of the prosecution's stated explanations." *Jackson*, 266 Va. at 436. The question of "[w]hether the defendant has carried his burden of proving purposeful discrimination in the selection of the jury is then a matter to be decided by the trial court." *Id.*

Griffin acknowledges on appeal that "the Commonwealth offered gender-neutral explanations for striking" four male jurors (Juror 14, Juror 17, Juror 21, and Juror 23) from the jury panel but argues that the facially-neutral explanations offered by the Commonwealth at trial "were mere pretext." As the Supreme Court stated in *Bethea v. Commonwealth*, 297 Va. 730 (2019),

> *Batson*'s treatment of intent to discriminate [i]s a pure issue of fact, and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference. This deference is understandable because the

> judicial evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province. [I]n the absence of exceptional circumstances, therefore, appellate courts should defer to the trial court because [a]ppellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation.

*Id.* at 756-57 (internal quotation marks and citations omitted) (alterations in original).

Griffin never argued at trial that the Commonwealth's gender-neutral and race-neutral explanations for striking Juror 14 and Juror 17 were merely pretextual. Consequently, we cannot reach Griffin's arguments concerning Juror 14 and Juror 17 because he failed to preserve them for review on appeal. *See* Rule 5A:18; *Bethea*, 297 Va. at 743 ("Not just any objection will do. It must be both *specific* and *timely* – so that the trial judge would know the particular point being made in time to do something about it."). Thus, we address on the merits only Griffin's arguments concerning Juror 21 and Juror 23.

At trial, the Commonwealth explained that it struck Juror 21 "because he was a neighbor of [Juror 1]" and because "[h]e also rolled his eyes at several attempts of humor" during *voir dire*. The record clearly establishes that Juror 21 knew Juror 1 and that Juror 21's answers to the Commonwealth were more abrupt and less expansive or engaged than Juror 1's responses. Furthermore, the Commonwealth also explained that Juror 21 had "rolled his eyes at several attempts of humor" during *voir dire*—while no similar concern was raised concerning Juror 1.

Regarding Juror 23, the prosecutor explained that she struck Juror 23 because he "didn't talk at all" and because she "couldn't see him during most of the selection" process, which she said meant that she did not "know enough about him." While it is true that other jurors did not speak either, the prosecutor emphasized that she "couldn't see [Juror 23] during most of the selection" process. This further impeded her ability to gain information about Juror 23 because she could not observe his body language or demeanor.

- 15 -

In this case, the prosecutor based her reasons for striking Juror 21 and Juror 23, in part, on concerns based upon her observations (or lack thereof) of the jurors' body language. A juror's body language or demeanor during *voir dire* is certainly a gender-neutral and race-neutral reason for striking a juror. *See Goodson v. Commonwealth*, 22 Va. App. 61, 81 (1996). Given that we, unlike the trial court, do not have the ability on appeal to view Juror 21's demeanor or assess whether the prosecutor actually had a poor view of Juror 23, we cannot (and should not try to) second-guess the trial judge's decision about the Commonwealth's likely motivation to strike these jurors. *See Davis v. Ayala*, 576 U.S. 257, 274 (2015) ("Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation."). Given that the prosecutor's explanations for using her peremptory strikes against Juror 21 and Juror 23 were certainly not inherently incredible, we cannot say that the trial court erred in crediting the prosecutor's gender-neutral and race-neutral explanations for striking Juror 21 and Juror 23. *See Bethea*, 297 Va. at 756 ("[A] trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference.").

For all of these reasons, we do not disturb the decision of the trial court to deny Griffin's *Batson* challenge.

## C. Admissibility of Character Evidence

In his third assignment of error, Griffin contends that the trial court erred in refusing to admit certain evidence, listed *supra*, in Section I(D), concerning Lenzen's character because the trial court's exclusion of this evidence was "in contravention of Rules 2:404(a)(2) and 2:404(b) of the Rules of the Supreme Court of Virginia and the Appellant's constitutional rights to Due Process, compulsory process, and the right to present evidence."[3] "[W]e review a trial court's

---

[3] Although Griffin asserts in only a single sentence of his brief that his "constitutional rights to Due Process, compulsory process, and the right to present evidence" were violated, he does not substantiate that mere assertion by providing any actual argument in his brief as to why

decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will

not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion."

*Avent v. Commonwealth*, 279 Va. 175, 197 (2010) (quoting *John Crane, Inc. v. Jones*, 274 Va.

581, 590 (2007)).

### 1. *Rule 2:404(a)(2)*

Virginia Rule of Evidence 2:404(a)(2) provides that "evidence of a pertinent character

trait or acts of violence by the victim of the crime" is admissible when "offered by an accused

who has adduced evidence of self defense." *See also Jones v. Commonwealth*, 71 Va. App. 70,

89 (2019); *Burford v. Commonwealth*, 179 Va. 752, 767 (1942). Griffin acknowledges on brief,

however, that "the [trial] Court determined that Mr. Griffin did not adduce evidence of

self-defense," and Griffin does not challenge that finding on appeal. Instead, he contends that

"the 'self-defense' language of Rule 2:404(a)(2) should extend to" the "defense of justified use

of force." However, the plain language of Rule 2:404(a)(2) simply does not allow a defendant to

enter otherwise inadmissible character evidence of the victim unless the defendant "has adduced

evidence of self defense." *See Browning v. Browning*, 68 Va. App. 19, 24 (2017) ("Rules of

statutory construction apply equally to the interpretation of the Rules, so that '[i]n construing the

language of rules and statutes, "we must give effect to the [drafters'] intention[s] as expressed by

the language used unless a literal interpretation of the language would result in a manifest

absurdity."'" (alterations in original) (quoting *Muse Construction Group, Inc. v. Commonwealth*

*Bd. for Contractors*, 61 Va. App. 125, 130-31 (2012))). Consequently, we hold that Rule

---

these mere assertions are actually so. Therefore, we do not reach this portion of his assignment of error on appeal. *See* Rule 5A:20(e) ("The opening brief of appellant *must* contain . . . [t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." (emphasis added)); *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008) ("Unsupported assertions of error 'do not merit appellate consideration.'" (citation omitted)).

2:404(a)(2) does not permit Griffin to present character evidence concerning the victim, Lenzen, because Griffin did not present evidence that Griffin acted in self-defense.

### 2. *Rule 2:404(b)*

As a general rule, "[e]vidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Va. R. Evid. 2:404(a). However, under certain circumstances, evidence of other crimes, wrongs, or acts "is admissible if it tends to prove any relevant fact pertaining to the offense charged." Va. R. Evid. 2:404(b). Griffin contends that the evidence of Lenzen's mental health history, of Lenzen's "history of violence," and of Lenzen's "history of resentment and hostility against first responders and hospital staff" is admissible under this exception because it was "relevant to the need for the use of force."

Griffin's argument essentially stands on the misguided premise that the entirety of Lenzen's mental health history and criminal record were relevant to the question of whether Griffin's use of force was reasonable under the circumstances present here. In *Graham v. Connor*, 490 U.S. 386, 396 (1989), the United States Supreme Court stated, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Consequently, evidence relevant to the question of whether Griffin's use of force was objectively reasonable would have been only circumstances *known to him* at the time of the incident.

The character evidence of the victim that Griffin contends was excluded in error largely consisted of incidents and observations by other individuals *after* the January 27, 2020 incident at issue before us now. For example, Griffin sought to admit testimony and supporting documentation of Lenzen's behavior at a different facility on July 1, 2020—six months after Griffin executed his take-down of Lenzen that is now before us. Given that July 1, 2020 incident

- 18 -

occurred many months later, this evidence could not have played any role in Griffin's use of force on January 27, 2020. Furthermore, testimony from others about their own experiences with Lenzen and knowledge of Lenzen's behavior do not bear on the reasonability of Griffin's decision because the specific details of their experiences did not inform Griffin's actions on that day. As the trial court explained, "[J]ust because somebody has this kind of history doesn't mean you can beat him around for no reason or if they look at you wrong." Finally, the trial court specifically permitted Griffin to testify—and Griffin actually testified at length—about his knowledge of Lenzen's mental health history and Lenzen's aggressive behaviors of which Griffin was aware on January 27, 2020. Consequently, the jury was able to hear quite a bit about Griffin's knowledge of Lenzen's character and how it informed his decision to take Lenzen to the ground that day.

Therefore, for all of the reasons stated *supra*, in subsection (C)(1) and (C)(2), we cannot say that the trial court abused its discretion in refusing to admit the evidence listed *supra*, in Section I(D), concerning Lenzen's character—especially given that the trial court allowed Griffin to testify about any information concerning Lenzen's character that was known to Griffin when he leg-swiped Lenzen to the ground.

### D. The Trial Court's Jury Instructions

In his fourth assignment of error, Griffin argues that the trial court "erred by failing to properly instruct the jury." Specifically, he contends that the trial court "erred by refusing to give [proffered] Jury Instruction I" and "erred by failing to give [proffered] Jury Instruction L" instead of Jury Instruction 11. An appellate court's "sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Swisher v. Swisher*, 223 Va. 499, 503 (1982). As the Virginia Supreme Court has stated, "As a general rule, the matter of granting and denying instructions

does rest in the sound discretion of the trial court." *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009). However, whether an instruction "accurately states the relevant law is a question of law that [the appellate court] review[s] de novo." *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014).

### 1. *Proffered Jury Instruction I*

Griffin contends that the trial court erred when it refused to give proffered Jury Instruction I. Specifically, Griffin argues that proffered Jury Instruction I accurately summarized the United States Supreme Court's decision in *Graham v. Connor* and provided instruction to the jury on "the legal standard for the use of non-lethal force" by police officers. Although "[i]t is the duty of the [trial] court to give instructions which correctly propound the law according to the different views of the parties to the matter," the trial court should not give "[a]n instruction which is confusing, argumentative, long, and merely an attempt on [the party's] part to have the court apparently agree with his theory of the case." *H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 937 (1962).

Here, proffered Jury Instruction I was long, argumentative, and not a neutral statement of the law. Indeed, it placed undue emphasis on certain evidence—rather than leaving those arguments for Griffin to make during closing argument. For example, proffered Jury Instruction I stated, "Police officers may use force to protect themselves or others against those persons whose actions would lead an objectively reasonable officer to believe pose a pending threat of assault against themselves or others given the facts and circumstances known to the officers at the time the force is used." By using the language "pending threat of assault," proffered Jury Instruction I specifically references evidence that tended to show that Lenzen posed a pending threat of assault against Griffin or others.

Furthermore, it does not appear that proffered Jury Instruction I is an entirely accurate statement of the law. Griffin specifically stated that "[t]his jury instruction comes from the [seminal] use of force case, *Graham v. Connor*." However, *Graham* does not contain support for all of the propositions put forth in that instruction. Specifically, one of the instructions contained in proffered Jury Instruction I states, "You [the jury] may not consider whether the officer could have used lesser force or some other method to protect himself or others." This portion of proffered Jury Instruction I simply does not find any support in *Graham* or in any other case which Griffin cites to this Court on brief.

Consequently, because proffered Jury Instruction I was long, argumentative, and, in part, without legal support, we cannot say that the trial court abused its discretion in refusing to provide that instruction to the jury.

### 2. *Proffered Jury Instruction L*

Griffin also contends that the trial court should have given the defendant's proffered Jury Instruction L, instead of giving Jury Instruction 11. Specifically, he argues that Jury Instruction 11 was inaccurate and misleading to the jury. However, the elements of battery listed in Jury Instruction 11 actually rather closely mirror the elements of battery as expressed by this Court in *Kelley v. Commonwealth*, 69 Va. App. 617, 625, 628 (2019) (holding that to sustain a conviction for battery the Commonwealth must prove that the defendant willfully or unlawfully touched another and that such touching was "done in a rude, insolent, or angry manner").

Furthermore, Jury Instruction 11 also correctly allocated the burden of proof to the Commonwealth. To the extent that Jury Instruction 11 may have confused the jury as to whether the Commonwealth needed to prove that Griffin touched Lenzen in an angry, rude, or insulting manner in addition to proving that Griffin acted with excessive force, the trial court certainly remedied any such issue by the clarifying instruction it issued following the jury's questions on

- 21 -

Jury Instruction 11. "A judicial response to a jury question is considered a legal instruction," *Ludwig v. Commonwealth*, 52 Va. App. 1, 11 (2008), and "[w]hen reviewing jury instructions on appeal, we read the instructions together and consider them as a whole," *Supervalu, Inc. v. Johnson*, 276 Va. 356, 366 (2008). In the trial court's clarifying instruction in answer to the jury's question, the trial court clearly and unequivocally instructed the jury that *regardless* of whether the jury found that Griffin used excessive force, the Commonwealth still "must prove that the touching was done in an angry, rude, insulting, or vengeful manner." This clarifying instruction, to which Griffin agreed, in conjunction with Jury Instruction 11, made clear to the jury that the Commonwealth bore the burden of proving each and every element of battery, including that the touching was done in an angry, rude, insulting, or vengeful manner. Consequently, we cannot say that the trial court erred.

### E. Sufficiency of the Evidence

In his fifth assignment of error, Griffin contends that the trial court "erred by denying Appellant's motion to strike the evidence and in convicting Appellant where the evidence adduced by the Commonwealth was insufficient to prove that Appellant used excessive force or that the Appellant touched Mr. Lenzen in an angry, rude, insulting, or vengeful manner." When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," *Riner v. Commonwealth*, 268 Va. 296, 330 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Crowder*, 41 Va. App. at 663 (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*)). "This familiar

standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

The slightest unlawful touching of another, "if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress." *Crosswhite v. Barnes*, 139 Va. 471, 477 (1924); *see Adams v. Commonwealth*, 33 Va. App. 463, 468 (2000). A police officer's use of "excessive force is a battery because that touching is not justified or excused and therefore is unlawful." *Gnadt v. Commonwealth*, 27 Va. App. 148, 151 (1998). "The reasonableness of the force is evaluated from the objective perspective of a reasonable police officer on the scene, allowing for officers to make 'split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary.'" *Cromartie v. Billings*, 298 Va. 284, 302 (2020) (quoting *Graham*, 490 U.S. at 397).

Here, the evidence showed that Lenzen, who was handcuffed and in Griffin's custody, had not made any attempts to flee Griffin's custody and had not made any threatening movements toward any of the hospital staff (or other patients). Furthermore, the evidence shows that Lenzen had been compliant with Griffin—at least until Griffin forced him to move a few steps closer to the registration counter. Although Griffin testified that he tried to calmly deescalate the situation, the witnesses at the hospital who were closest in proximity to Griffin and Lenzen did not corroborate this account. After one or two demands that Lenzen "stop resisting," Griffin not only put both his hands on Lenzen but also almost immediately leg-swiped the handcuffed man's legs out from under him, sending Lenzen face-first into the hard hospital floor, breaking Lenzen's patella, cutting Lenzen's forehead around his eyebrow, and injuring his nose. Given this evidence in the record, we certainly cannot say that no rational fact finder could

- 23 -

conclude that Griffin willfully touched Lenzen in a manner that was rude and insulting—and that the force Griffin used was excessive under the circumstances.

## III.  CONCLUSION

For all of the foregoing reasons, we affirm the trial court's decision in convicting Griffin of assault and battery.

*Affirmed.*